## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| In re Application of Daniel Snyder for an Order Directing Discovery from Mary Ellen Blair and Comstock Holding Companies, Inc. Pursuant to 28 U.S.C. § 1782 | Misc. Action No. _____<br><br>*Ex Parte* Petition for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 |

Based upon the annexed Declaration of Rizwan A. Qureshi, Esq., dated August 10, 2020 ("Qureshi Decl."), petitioner Daniel Snyder ("Mr. Snyder" or "Petitioner") respectfully petitions this Court *ex parte* for an Order pursuant to 28 U.S.C. § 1782, compelling Mary Ellen Blair ("Blair"), an individual residing in this District, and Comstock Holding Companies, Inc. ("Comstock," and together with Blair, "Respondents"), a corporation that does business within this District, to produce discovery for use in a proceeding currently pending in India.

### I. INTRODUCTION

1. Petitioner seeks discovery from Respondents in aid of litigation currently pending in The High Court of Delhi at New Delhi (the "Indian Court"), bearing the caption *Daniel Snyder Through His SPA Holder vs. Eleven Internet Services LLP & Ors.*, filed August 7, 2020 (the "Indian Action").

2. The Indian Action arises from the publication of a series of false and defamatory "news" articles targeting Petitioner on the MEA WorldWide website, located at www.meaww.com ("MEAWW"). The articles contain flagrantly false statements about Petitioner, including but not limited to accusing Petitioner of sexual misconduct, such as involvement in sex trafficking, and a purported affiliation with sexual predator Jeffrey Epstein.

3. In the Indian Action, Petitioner asserts claims for defamation *per se* against the authors of these articles, as well as Eleven Internet Services LLP ("Eleven") which, upon information and belief, directed the publication of those false and defamatory articles on behalf of hidden third-party clients.

4. Upon information and belief, Blair – a disgruntled former employee of the Washington Football Team (the "Team"), of which Petitioner is the majority owner – is an active participant, for pay from third parties, and/or arising from personal animus, in the same campaign of defamation against Petitioner that led to the publication of the subject defamatory articles, including serving as a source for the false and libelous claims in said articles.

5. Blair further directly offered or alluded to the availability of bribes to current employees of the Team and the Petitioner, attempting to elicit further false statements about Petitioner to be published by MEAWW and other outlets.

6. Upon information and belief, Blair acted at the direction of, and/or with the financial support of, the same individual(s) who hired and directed Eleven and MEAWW to publish their defamatory articles about Petitioner.

7. Blair possesses highly relevant documents and information relating to, *inter alia*, the creation of the Defamatory Articles (as defined herein); the parties behind payments made in order to procure the posting of the Defamatory Articles; amounts and sources of bribes offered and/or paid to sources of information upon which the Defamatory Articles were based; and her own – as well as third parties' – efforts to discredit and damage the Petitioner and the Team. The *Subpoena Duces Tecum* and *Subpoena Ad Testificandum* that Petitioner seeks to serve on Blair are attached to the Qureshi Decl. as **Exhibit A** and **Exhibit B** respectively.

8. Moreover, upon information and belief, Blair's connection to the subject matter of the Indian Action, and the bribes she offered or alluded to, includes benefits she receives from a financial benefactor. Upon information and belief, among these benefits are long-running discounted rent, as well as more recent promotion to luxury accommodations, the payment for which would be beyond her apparent financial means. Petitioner therefore seeks discovery from Comstock – the owner of the luxury apartment buildings in which Blair has rented multiple units, known as the "BVLD Reston Station" and "BLVD Loudon Station" complexes – that will shed light on Blair's motive for seeking to defame Petitioner, and the nature of her ties to other participants in the same scheme. The *Subpoena Duces Tecum* and *Subpoena Ad Testificandum* that Petitioner seeks to serve on Comstock are attached to the Qureshi Decl. as **Exhibit C** and **Exhibit D** respectively.

9. The documents and information in Respondents' possession, custody and/or control indisputably will aid the Indian Court in resolving Petitioner's defamation claims.

10. As discussed herein, Petitioner meets all the statutory criteria for the issuance of an order allowing the requested discovery. *See* 28 U.S.C. § 1782. Additionally, all the discretionary factors that this Court may consider favor granting this Petition. Petitioner thus respectfully requests that his Petition be granted. A proposed order is attached to the Qureshi Decl. at **Exhibit E**.

**II.    PARTIES TO THIS PETITION**

11. Petitioner Daniel Snyder is an individual who resides in Maryland. Mr. Snyder is the majority owner of the Team.

12.     Respondent Mary Ellen Blair is an individual residing in this District, in Reston, Virginia. Blair was employed by the Team as an executive assistant between 2013 and 2017 before being terminated. Blair currently resides at a luxury apartment development owned by Comstock.

13.     Respondent Comstock is a property management company that conducts business within this District. Specifically, Comstock manages the apartment building in Reston, Virginia, in which Blair currently lives and has rented several units.

### III.    JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this application under 28 U.S.C. §§ 1331 and 1782. This Court has personal jurisdiction over Respondents because they reside in the Commonwealth of Virginia and in this Judicial District.

15.     Under 28 U.S.C. §§ 1391(c) and 1782, venue is proper in this Judicial District because Respondents reside in this District.

### IV.    THE INDIAN ACTION

#### A.    Parties to the Indian Action

16.     Petitioner has asserted a claim for defamation *per se* in the Indian Court against Indian company Eleven, and its Indian subsidiary MEAWW, as well as Indian residents Anay Chowdhary ("Anay") and Nirnay Chowdhary ("Nirnay"), Prarthna Sakar ("Sakar") and Jyotsna Basotia ("Basotia").

#### B.    The MEAWW Website and the Defamatory Articles

17.     MEAWW purports to be, and holds itself out as, a news website. MEAWW publishes "news" stories regarding a broad variety of matters, including pop culture, law and government, and media and entertainment.

18.     In reality, however, rather than being legitimate news sources and reporters, MEAWW intentionally sows disinformation at the behest of its undisclosed clients, including

governments and intelligence services, and often is hired by clients that are cloaked behind several layers of anonymous corporate entities. MEAWW thus acts as a hired agent of these unnamed entities to knowingly spread, among other things, false and defamatory statements concerning its clients' rivals.

19. MEAWW has worldwide reach, as it publishes globally via the internet and receives internet traffic from the United States, India, and many other countries around the world. It has touted itself as having more than 150 million unique users and more than 1 billion page views per month.

20. On or about July 16, 2020, MEAWW posted several false and wholly fabricated articles — written by Sakar and Basotia, and published at the direction of the Chowdhary brothers — regarding Petitioner, which falsely accuse him of a broad array of acts of criminal sexual misconduct including, among other things, involvement in sex trafficking, and affiliating with sexual predator Jeffrey Epstein (collectively, the "<u>Defamatory Articles</u>").

21. These included "Washington Redskins owner Dan Snyder faces sex trafficking allegations; Internet says, 'He was on Epstein's list,'" published at https://meaww.com/washington-redskins-owner-dan-snyder-to-step-down-owing-to-sex-trafficking-allegations-fan-reaction (the "<u>First Defamatory Article</u>"). The First Defamatory Article falsely states that Mr. Snyder "has found himself in trouble yet again and this time it's allegedly for sex trafficking. The minority owners [of the Washington Football Team] are apparently looking at bringing him down citing inappropriate and unchaste behavior as one of the major reasons." The First Defamatory Article went on to publish utterly baseless speculation regarding whether a then-forthcoming *Washington Post* article about the Washington Football Team "would be about [Snyder's] alleged involvement in sex trafficking[,]" quoting several

anonymous posters from the internet forum Reddit.com, including baselessly quoting that "[Snyder] is getting [arrested] for sex trafficking. He was on [Jeffrey] Epstein's list too." *Id.*

22.  MEAWW published a second article on July 16, 2020: "#RedskinsScandal: Will Dan Snyder rename Washington Redskins the 'Epsteins'? Angry Internet screams 'throw him out,'" published at https://meaww.com/washington-redskins-dan-snyder-jeffrey-epstein-sexual-harrasment-sex-trafficking-scandal-name-change (the "Second Defamatory Article," and together with the First Defamatory Article, the "Defamatory Articles").  The Second Defamatory Article refers to, and repeats, the false allegations of the First Defamatory Article: namely, the false claims that Mr. Snyder is linked to sexual predator Jeffrey Epstein and that Mr. Snyder is or was involved in sexual misconduct, including sexual harassment and/or sex trafficking.

23.  These blatantly false and wholly fabricated articles purport to be factual news stories, but were and are utterly untrue and have no legitimate journalistic basis whatsoever.

24.  However, although MEAWW publicly named "the internet" as its source for the false and libelous statements in the Defamatory Articles, upon information and belief Blair either furnished, or procured for, the defendants in the Indian Action false and unsubstantiated claims regarding Mr. Snyder in connection with MEAWW's drafting of the Defamatory Articles.

25.  The statements that MEAWW published about Mr. Snyder are categorically false. Moreover, the defendants in the Indian Action published these defamatory, inflammatory statements about Mr. Snyder with deliberate intent to damage Mr. Snyder, or at best, complete disregard for their basis in fact.

26.  Although MEAWW reluctantly removed the Defamatory Articles after Petitioner demanded their immediate removal, the damage to Mr. Snyder's reputation had already been done.

27. Mr. Snyder's children and other family members, and numerous of Mr. Snyder's friends, neighbors, and business associates, were exposed to the Defamatory Articles, either by directly viewing the Defamatory Articles online or by receiving word of the Defamatory Articles. Consequently, Mr. Snyder's reputation and good standing has been severely harmed, and will continue to be harmed, by the Defamatory Articles, and the members of Mr. Snyder's family have been severely harmed due to the publication of these lies on behalf of hidden third-party clients of MEAWW.

28. The false allegations that the defendants in the Indian Action have seeded on the internet have taken root beyond MEAWW itself. For instance, on or about July 16, 2020 – not coincidentally, the very same day that MEAWW published the Defamatory Articles at issue herein – the following appeared on a Twitter account that has been confirmed as a fake account existing for no purpose other than to propagate false and misleading information:

> According to insiders and anonymous Washington Post employees, the [upcoming] article will allege that: Dan Snyder abuses drugs and alcohol[;] Snyder paid off refs. Some refs have made $2 million from him. And Snyder is not the only team owner paying off refs. Others do it too. Snyder and former Redskins coach Jay Gruden, brother of Jon Gruden, pimped out their cheerleaders to season ticket holders while holding their passports from them in a foreign country. Jay Gruden and then Redskins running back Kapri Bibbs were sleeping with the same woman. When Jay found out, he got petty and benched Bibbs. During that game when Bibbs was on the bench, Bibbs' replacement missed a block and that resulted in quarterback Alex Smith suffering a broken leg. Alex hasn't been able to play football ever since[.] Snyder and Gruden would hold sex parties with rampant drug usage and some sexual assaults[.] Snyder held nude photoshoots with the Redskins cheerleaders[.] Lawyers are already involved[.]

Whether this account is one of the "Bots" utilized regularly by MEAWW to further propagate its for-profit lies, or written by a human agent of MEAWW, will be further elucidated through discovery sought herein.

29. Petitioner commenced the Indian Action on August 7, 2020, asserting claims for defamation *per se* arising out of the Defamatory Articles. Petitioner seeks damages of $10 million.

## V. BLAIR DEMONSTRATED KNOWLEDGE OF FORTHCOMING FALSE AND DEFAMATORY ARTICLES WELL IN ADVANCE OF THEIR PUBLICATION, WHILE SEEKING TO BRIBE OR OTHERWISE SOLICIT EMPLOYEES OF PETITIONER AND THE TEAM TO PROVIDE INFORMATION IN SUPPORT OF THOSE ARTICLES

30. During her term with the Team as an assistant to Petitioner, Blair frequently interacted with various current and former Team employees, and developed relationships with employees of the Team as a result.

31. When Blair was terminated (after having previously been demoted), she left on bad terms and has since admitted to having absconded with confidential information belonging to Petitioner and/or the Team.

32. Further, it has recently come to light that, at the time Blair applied for her employment with the Team, she had a substantial criminal record. Indeed, when Blair applied for the job, she was still on probation for an embezzlement conviction: after being charged with felony embezzlement, she pled guilty to misdemeanor embezzlement and was required to serve twelve months' probation.

33. At all relevant times, including years before her term of employment with the Team, Blair appears to have been consistently in dire financial straits. Her wages have been garnished, including while she was in the Team's employ; she has a substantial history of judgments and liens against her; and she has been evicted several times.

34. In more recent years, however, Blair's financial difficulties have been alleviated by a financial benefactor through at least the following:

- Blair has stated that she received discounted rent between 2015 and at least late 2017 at two buildings owned by Comstock.

- In 2018, Blair moved to another luxury apartment building, also owned by Comstock.

- Blair has acknowledged that since 2018, she has paid $2,100 a month in rent for her luxury apartment. Within the last 60 days, Ms. Blair upgraded to an even more luxurious apartment within the same building. Her ability to afford this monthly rent seems highly questionable based on public information pertaining to her current employment, as well as the significant public history of her financial difficulties as described above.

35. Blair has exhibited advance knowledge of numerous forthcoming negative publications about Petitioner and the Team. For example, in late May or early June 2020, Blair contacted a Team employee who has frequent contact with Petitioner. During their conversation, Blair told that employee that Blair had been asked about her contacts on the Team. This was consistent with what Blair had told that employee on several occasions previously – that is, that she stole confidential personal contact information for the Team's employees and Petitioner's business associates.

36. Blair also stated that she had been told by someone not employed by the *Washington Post*, but well known to both that employee and to Blair, that an article would be published in the *Washington Post* in approximately a week that would "not [be] good for Dan." Blair further implied that she was in contact with the *Washington Post* in connection with this story.

37. The Team employee stated that the article Blair had advanced knowledge of eventually was published by the *Washington Post* on July 5, 2020, and it stated that the minority owners of the Team were looking to sell their stakes in the Team, and were "not happy being a partner" of Petitioner. This article cited "multiple people familiar with the deliberations." This article was, of course, published weeks before the defamatory articles at issue herein.

38. Not coincidentally, throughout at least early July through early August 2020, Blair used the confidential personal contact information she admittedly stole from the Team to contact employees and affiliates of the Team and Petitioner to fish for negative information — regardless

of its veracity — regarding Petitioner, including sometimes offering or sometimes alluding to the availability of, bribes for information to be provided to her, or to unspecified publications.

39. To that end, Blair called a long-time personal employee of Petitioner on July 8, July 18 and August 1, 2020.  During these calls, the longest of which pre-dated the July 16, 2020 MEAWW articles, Blair exhibited her advance knowledge regarding publication of stories, and stated that "something big was going to happen" and that several of the Team's minority owners did not want to do business with Petitioner any longer.  These interactions have been recorded, and have been memorialized in sworn affidavit testimony.

40. In her July 8, 2020 conversation with this personal employee of Petitioner, Blair said there would be a "big story" in the *Washington Post* about Petitioner; and that the story would be about how Petitioner was doing "dirty" and "illegal" things.  In the calls with this employee, Blair also stated that Petitioner "do[es] drugs," and consistently emphasized her personal animus toward Petitioner, whom she felt had treated her unfairly.

41. Of course, the *Washington Post* story on July 16, 2020 did not include any false and defamatory statements about Petitioner doing "illegal" or "dirty" things.  <u>Only the MEAWW stories included any allegations of "illegal" or "dirty" activities</u> – namely that Petitioner engaged in sex trafficking and was affiliated with Jeffrey Epstein.

42. Even before her lengthy call with the above-referenced personal employee of Petitioner, on July 7, 2020, Blair called another employee (of the Team) who works closely with Petitioner on a daily basis.  Blair asked this employee what the employee thought was going on between Petitioner and his partners.  Blair also stated that "karma is a mother" and "karma always comes back" in reference to the Petitioner.  Blair told the employee that the employee could "probably make a lot of money" for any information the employee had about Petitioner, pausing

to see if the employee would bite on the hook and offer something up about Petitioner in exchange for pay.  The employee did not do so.

43. On July 16, 2020 – the very same day MEAWW published the Defamatory Articles at issue in the Indian Action – the *Washington Post* published an article about the Team alleging instances of sexual harassment against Team employees by other Team employees.  The article expressly did not accuse Petitioner of any form of sexual or sexist misconduct, and noted that the Team had already fired numerous figures accused of misconduct and hired attorney Beth Wilkinson to complete a thorough investigation of the claims.

44. Based on the pattern of Blair's interactions with Team employees, it is clear that she was deliberately soliciting negative information about Petitioner — without regard for whether it was true or false — which she herself explicitly linked to (i) forthcoming media coverage that would be damaging to Petitioner and (ii) the deliberate intent to harm him.

45. Blair also repeatedly told at least the employees of the Team and Petitioner discussed herein that she was in contact with and working in coordination with a third party – not a journalist, but rather someone well known to each of the involved persons – and that both that third party and Blair were involved in the preparation of one or more articles expected to be harmful to Petitioner.

46. Further, the timing of Blair's fishing expedition for information on "illegal" and "dirty" acts with regard to Petitioner coincides with the period in which the defendants in the Indian Action were preparing the Defamatory Articles.

47. Blair has exhibited knowledge of upcoming, non-public events in other contexts as well.  While still employed by the Team, she told a Team employee who interacts with Petitioner frequently that she had been in contact with the Federal Bureau of Investigation about another

Team employee. She stated that this Team employee was involved in distributing pirated DVDs, and a few weeks later, that Team employee was arrested by the FBI and subsequently terminated. Ms. Blair then was promoted to that Team employee's position.

48. For all of the foregoing reasons, Petitioner has ample reason to believe that Blair played a significant role in a deliberate and coordinated campaign, in conjunction with third parties, intended to defame and spread corrupt disinformation about Petitioner. This campaign included communications with media outlets including, upon information and belief, MEAWW. The *prima facie* who, what, when, where, and why of the scheme—and Blair's involvement in it—is clear, but Petitioner requires discovery from Blair and Comstock to investigate further in support of the Indian Action.

## VI.   DISCOVERY REQUESTED

49. Upon information and belief, Respondents are in possession, custody, and/or control of substantial documentary information — including emails, text messages, electronic and physical notes, call records, and other documents — that would demonstrate their connections to MEAWW, other third parties hostile to Petitioner, and the coordination between each of the foregoing to disparage and defame Petitioner — all of which is currently at issue in the Indian Action. Moreover, Respondents themselves have personal knowledge of the same. Accordingly, Respondents possess documents and information that bear directly upon the issues in the Indian Action and which Petitioner would be unable to obtain through discovery in the Indian Action.

50. As set forth in further detail in the subpoenas, Petitioner seeks discovery concerning (1) the substance and timing of Blair's communications with the defendants in the Indian Action; (2) the substance and timing of Blair's communications with any other media entities regarding Petitioner and/or the Team; (3) the identities of any other third parties involved in directing, coordinating with or supporting Blair to solicit or obtain negative information about Petitioner; (4)

the identities of any other third parties with whom Blair communicated with the explicit or implicit purpose of obtaining negative information about Petitioner and/or the Team; (5) any housing-related or other benefits received by Blair including but not limited to housing credits, rent forgiveness, direct payments or other compensation or any other form of preferential treatment; and (6) other documents and information that are relevant to the Indian Action and are available solely through Respondents.

51. In addition to requests for the production of documents from Respondents, Petitioner seeks to depose both Respondents concerning the subject matters described above and in the respective subpoenas directed to Blair and Comstock.

## VII. PETITIONER IS ENTITLED TO THE DISCOVERY SOUGHT HEREBY

### A. Section 1782 Governs this Court's Authority to Order Discovery

52. 28 U.S.C. § 1782(a) provides, in pertinent part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

53. Since 1948, "Congress [has] substantially broadened the scope of assistance federal courts could provide for foreign proceedings," pursuant to § 1782. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256-57 (2004).

54. Indeed, courts in this Circuit have repeatedly recognized the liberal policy in favor of granting petitions for judicial assistance under § 1782. *Servotronics, Inc. v. Boeing Co.*, 954 F.3d 209, 213 (4th Cir. 2020) (reversing denial of § 1782 application in light of Congressional policy objectives). A district court should consider a Section 1782 request in the light of the statute's aims of providing efficient means of assistance to participants in international litigation

in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 252 (2004); *In re Request for Judicial Assistance from the Dist. Court in Svitavy*, 748 F. Supp. 2d 522, 525 (E.D. Va. 2010).

### B. Petitioner Satisfies the Requirements under Section 1782

55. A district court has authority to grant an application for judicial assistance pursuant to Section 1782 if the following requirements are met: "(1) the person from whom discovery is sought resides or is found in the [Eastern District of Virginia]; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by a foreign or international tribunal or 'any interested person.'" *Svitavy*, 748 F. Supp. 2d at 525 (citing *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 192 (S.D.N.Y. 2006)). Each of these prerequisites for this Court to order discovery in aid of the Indian Action is satisfied.

56. *First*, Blair is an individual currently residing within this District at 1908 Reston Metro Plaza, Reston, VA 20190. Comstock, likewise, resides in this District. *See* Qureshi Decl., **Exhibit F**.

57. *Second*, this request seeks the production of documents from and testimony by Respondents in support of the Indian Action. A true and correct copy of the pleadings filed in the Indian Action is attached to the Qureshi Decl. as **Exhibit G,** and copies of the proposed subpoenas to be served on Respondents are annexed to the Qureshi Decl. as **Exhibits A through D**. As set forth above, the discovery that Petitioner seeks is intended to further establish the liability of the defendants in the Indian Action, by elucidating their bad faith and active participation in a broader scheme to defame Petitioner with the direct or indirect assistance of Blair.

58. ***Third***, Petitioner is an "interested person" within the meaning of 28 U.S.C. § 1782. An interested person is one who has significant "participation rights" in the foreign action. *Intel*, 542 U.S. at 256-57. As the Supreme Court noted in *Intel*, "litigants are included among, and may be the most common example, of the 'interested person[s]' who may invoke § 1782." 542 U.S. at 256. Petitioner is the plaintiff in the Indian Action, and therefore is an "interested person" for the purposes of § 1782.

59. Accordingly, Petitioner's request satisfies the elements necessary to permit discovery pursuant to 28 U.S.C. § 1782, as recognized in this Circuit.

    **C.**    **The Court Should Exercise its Discretion to Grant Petitioner the Discovery He Seeks**

*60.* Once the statutory requirements of 28 U.S.C. § 1782 are met, the district court is free to grant discovery in its discretion. *See Schmitz v. Bernstein, Liebhard & Lifshitz, LLP*, 376 F. 3d 79, 83 (2d Cir. 2004). The Supreme Court has identified a number of factors for courts to consider when ruling on a § 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the foreign proceeding, and the receptivity of the foreign court to federal-court assistance; (3) whether the application conceals an attempt to circumvent foreign proof-gathering restrictions of a foreign country; and (4) whether the application is unduly intrusive or burdensome. *See Intel*, 542 U.S. at 264-65; *Chevron Corp.*, No. 7:10-MC-00067, 2010 U.S. Dist. LEXIS 125174, at *6-7 (W.D. Va. Nov. 24, 2010) (*quoting id.*). Here, all of these factors weigh in favor of granting the application.

61. ***First***, where, as here, discovery is sought from a party that is not participating in the foreign proceeding, the need for court-ordered discovery is apparent. As the Supreme Court explained: "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order

them to produce evidence. In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782 aid." *Intel*, 542 U.S. at 264 (internal citations omitted). Respondents are not parties to the Indian Action and, upon information and belief, have no legal presence in India. Thus, the Indian Court has no jurisdiction to acquire the documents and testimony that Petitioner seeks here and which are critical to Petitioner's ability to prove his claims in the Indian Action.

62. ***Second***, courts must look at the nature of the foreign proceeding and the receptivity of the foreign tribunal to federal court assistance. Here, there is no evidence that the discovery sought in this application would "offend" the Indian Court. To the contrary, the discovery sought would relate to the lack of truth in the Defamatory Articles and shed light on the authors' motivations in posting the Defamatory Articles, goals which are directly relevant to the Indian Action.

63. ***Third***, this application is not an attempt to circumvent any foreign proof-gathering restrictions and does not violate any Indian restrictions on gathering evidence.[1] Petitioner has a good-faith basis for believing that he will be able to use these materials in the Indian Action. Petitioner has no reason to believe that the Indian Court would not be receptive to the judicial assistance requested, nor is Petitioner aware of any limitation on discovery imposed by the Indian Court, either generally or specifically, such that the request would "circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S.

---

[1] As the Supreme Court noted in *Intel*, the Court's analysis of a Section 1782 application does not extend to the discoverability or admissibility of the information in the foreign forum. *See Intel*, 542 U.S. at 260 ("Beyond shielding material safeguarded by an applicable privilege, however, nothing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there.").

241 at 264-65. The Court's grant of judicial assistance would permit Petitioner to appropriately prosecute its claim against Eleven, along with the authors of the Defamatory Articles and Eleven's relevant principals and affiliates, in India given that Respondents are in exclusive possession of information highly relevant to Petitioner's claim.

64. *Fourth*, the document requests in the proposed subpoenas are neither unduly burdensome nor intrusive. Petitioner has tailored his requests to seek only those materials relevant to the Indian Action, and the documents requested lend themselves to easy identification and production.

## VIII. CONCLUSION

65. For the reasons set forth herein, Petitioner respectfully requests that the Court issue an Order, pursuant to 28 U.S.C. § 1782, granting Petitioner leave to serve Blair and Comstock with the subpoenas appended to the Qureshi Decl. as Exhibits A and B, and C and D, respectively.

Dated: August 10, 2020
      McLean, Virginia

REED SMITH LLP

By: */s/ Brittany Davidson*
    Brittany Davidson
7900 Tysons One Place, Suite 500
McLean, VA 22102
Tel: (703) 641-4200
bdavidson@reedsmith.com

Rizwan A. Qureshi
1301 K Street NW
Suite 1000, East Tower
Washington, DC 20005
Tel: (202) 414-9200
rqureshi@reedsmith.com

Joseph Tacopina
TACOPINA, SEIGEL & DEOREO
275 Madison Avenue

New York, New York 10016
Tel: (212) 227-8877
jtaopina@tacopinalaw.com

*(Admission Pro Hac Vice Pending)*

*Attorneys for Petitioner
  Daniel Snyder*