## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA

In re Application of Daniel Snyder
for an Order Directing Discovery from Mary
Ellen Blair and Comstock Holding Companies,
Inc. Pursuant to 28 U.S.C. § 1782

Misc. Action No. 1:20-mc-00023-LO-TCB

## REPLY IN SUPPORT OF *EX PARTE* PETITION
## FOR ASSISTANCE IN AID OF A FOREIGN PROCEEDING
## PURSUANT TO 28 U.S.C. § 1782

Christopher J. Williams (VSB No. 87234)
NOVA BUSINESS LAW GROUP, LLP
4151 Chain Bridge Road
Fairfax, VA 22030
Tel: (703) 766-8081
cwilliams@novablg.com

Joseph Tacopina
TACOPINA, SEIGEL & DEOREO
275 Madison Avenue
New York, New York 10016
Tel:  (212) 227-8877
jtacopina@tacopinalaw.com

*(Admission Pro Hac Vice Pending)*

*Attorneys for Petitioner*
   *Daniel Snyder*

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.     The Requested Discovery is Within the Broad Scope of Section 1782 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.     The Information Sought is For Use in a Foreign Action . . . . . . . . . . . . . . . . . . . . 4

     C.     The Court Should Exercise its Discretion to Permit the Requested Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          1.     The Discretionary Factors Support this Petition . . . . . . . . . . . . . . . . . . . . 6

          2.     Comstock's Cited Authorities are Inapplicable . . . . . . . . . . . . . . . . . . . . 6

          3.     Petitioner has Sufficient Reason For the Discovery Sought . . . . . . . . . . . 9

          4.     Comstock Attempts to Distract From the Relevant Analysis . . . . . . . . . . 11

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGES**

*Al Fayed v. U.S.*, 210 F.3d 421 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Cook v. Howard*, 484 F. App'x 805 (4th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

*EEOC v. Dolgencorp, LLC*, No. SAG-18-2956, 2019 U.S.
Dist. LEXIS 220340 (D. Md. Dec. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Green Dev. Corp. S.A. De C.V. v. Zamora*, No. 15-21594-MC,
2016 WL 2745844, at *2 (S.D. Fla. May 10, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8 n. 3

*In re Chevron Corp.*, No. 7:10-MC-00067, 2010 U.S. Dist.
LEXIS 125174 (W.D. Va. Nov. 24, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Green Dev. Corp. S.A. de C.V.*, No. WDQ-15-2985,
2015 WL 10319091 (D. Md. Oct. 1, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,7-8

*In re Green Dev. Corp. S.A. De C.V.*, No. CV CCB-15-2985,
2016 WL 640791 (D. Md. Feb. 18, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7 n.2

*In re Request for Judicial Assistance from the Dist.
Court in Svitavy*, 748 F.Supp.2d 522 (E.D. Va. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S.
241 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2,5-6

*Mees v. Buiter*, 793 F.3d 291 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

*Servotonics, Inc. v. Boeing Company*, 954 F.3d 209
(4th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2


**STATUTES AND RULES**

28 U.S.C. § 1782 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2, 5-8

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

In re Application of Daniel Snyder
for an Order Directing Discovery from Mary
Ellen Blair and Comstock Holding Companies,
Inc. Pursuant to 28 U.S.C. § 1782

Misc. Action No. 1:20-mc-00023-LO-TCB

**Reply in Support of *Ex Parte* Petition for
Assistance in Aid of a Foreign Proceeding
Pursuant to 28 U.S.C. § 1782**

## PRELIMINARY STATEMENT

It is a well-known quip among lawyers that "when you have the law on your side, you

argue the law; when you have the facts on your side, you argue the facts; and when you don't have

the facts or the law on your side, you pound the table." Tellingly, Comstock is pounding the table.[1]

Comstock's opposition to Petitioner's motion for discovery in aid of the Indian Action

relies on meritless legal contentions and factual points that are unresponsive to the governing legal

standard. For instance, the employment situation of former Comstock employee Norman Chirite

has nothing to do with the Indian Action, the discovery Plaintiff seeks, or the standard set by the

Supreme Court of the United States for Section 1782 applications such as this one.

Likewise, whether other Team employees received discounts at Comstock's properties

over the years does not bear on the appropriate discovery Petitioner seeks from Comstock. Here,

Comstock gave Blair discounted rent after she was no longer an employee of the Team for three

years. Comstock's efforts to muddy the waters, in short, are unavailing.

This Court is faced with a simple inquiry: are the mandatory requirements for Section 1782

discovery satisfied? And if they are, do the discretionary factors outlined in *Intel Corp.* favor

---

[1] Except where otherwise indicated, capitalized terms shall have the meanings ascribed to them in the moving
papers. [ECF 1]

discovery? The answer to both questions is yes; Comstock has not established otherwise; and therefore Petitioner's application should be granted.

## ARGUMENT

### A. The Requested Discovery is Within the Broad Scope of Section 1782

A district court has authority to grant an application for judicial assistance pursuant to 28 U.S.C. § 1782 if the following requirements are met: "(1) the person from whom discovery is sought resides or is found in the [Eastern District of Virginia]; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by a foreign or international tribunal or 'any interested person.'" *In re Request for Judicial Assistance from the Dist. Court in Svitavy,* 748 F.Supp.2d 522, 525 (E.D. Va. 2010) (citing *In re Microsoft Corp.,* 428 F.Supp.2d 188, 192 (S.D.N.Y. 2006)). Comstock does not dispute that the first and third conditions are met. Its opposition hinges on speculation that the discovery Petitioner seeks is not "for use in a proceeding before a foreign tribunal[.]" *See* ECF. 6 at p. 9.

Section 1782 affords district courts broad discretion to conduct discovery in aid of foreign proceedings, and statutory history shows Congress's intent to widen the scope of discovery available under the law. *See Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 247-49 (2004); *Servotonics, Inc. v. Boeing Company,* 954 F.3d 209, 213 (4th Cir. 2020); *Al Fayed v. U.S.,* 210 F.3d 421, 424 (4th Cir. 2000). In particular, the "for use" requirement does not demand that the information sought be necessary to prevail in the foreign proceeding: anything that "can be made use of in the foreign proceeding to increase [an applicant's] chances of success" will meet this condition. *Mees v. Buiter,* 793 F.3d 291, 299 (2d Cir. 2015).

The Indian Action is not opaque or difficult to interpret: it is a defamation suit. The thrust of Petitioner's allegations in the Indian Action can be fairly summarized as an argument that an

Indian publication—MEAWW—participated in a consciously coordinated campaign to defame and harass Petitioner. Petitioner has asserted that MEAWW did not act independently: it published defamatory articles regarding Petitioner at the request of currently-unknown clients. *See* Ex. G [ECF 1-9]. The basis for Petitioner's request for discovery concerning Blair's involvement is readily apparent: during the relevant time period, prior to and after MEAWW's publication of the defamatory articles, Blair repeatedly contacted employees of the Team to ask for negative information regarding Petitioner, and explicitly linked her doing so to upcoming media articles relating to Petitioner and the Team. *See* ECF 1, at ¶¶ 30-48. Given the timing and the substance of Blair's "fishing expeditions," which included directly offering or alluding to the availability of bribes to current employees of the Team, Petitioner has ample reason to believe that Blair was actively involved in the same campaign of disparaging media that produced MEAWW's defamatory articles about Petitioner. As such, Blair is in possession of information that is critically important to the Indian Action.

The discovery sought from Comstock is part and parcel of the information concerning Blair's role in what Petitioner believes to be a deliberately-organized strategy to defame him. Specifically, Blair lives in Comstock's luxury apartments, although Petitioner knows Blair to have had serious financial difficulties, including liens and judgments against her, garnishment of her wages, and previous evictions. *See* ECF 1, at ¶ 33. Petitioner also recently has become aware that Blair has had additional financial difficulties due to substantial underreporting of her tax liabilities over numerous years, and has received assistance from a third-party benefactor in resolving these issues. The inconsistency is clear, and Comstock does not deny it. Discovery investigating how Blair is able to afford her luxury apartments—particularly to the extent a financial benefactor is responsible—is fair game, representing a relevant facet of Blair's participation in a larger scheme

to defame Petitioner.  Moreover, Petitioner has narrowly tailored the discovery sought against Comstock to focus on this issue: the discovery at issue is not overbroad, unduly burdensome, or beyond the parameters of the Indian Action.

**B.  The Information Sought is For Use in a Foreign Action**

At the outset, Comstock contends that the information sought is not "for use" in a foreign action based on its overly narrow analysis of the issues involved in the India Action.  In short, Comstock asserts that "[t]he issues concern whether the statements are false and defamatory, whether the defendants knew or had reason to know that those statements were false, and whether those statements damaged Snyder." *See* ECF 6 at p. 13.  However, that myopic view fails to recognize the fact that Blair's participation in a smear campaign against Petitioner, incentivized by the receipt of consideration rather than a desire to report the truth, goes to the very heart of whether the statements at issue were indeed false.  Nevertheless, how Petitioner intends to use the discovery sought in the India Action is not determinative on whether he should be granted access to it:

> [W]hile it is not entirely clear from Petitioner's application how the fruits of its intended discovery would be used in the pending appellate proceeding before the Honduran Supreme Court, the federal courts' broad interpretation of this statutory requirement leads me to conclude that the requested discovery is "for use in a proceeding." *See e.g., In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil,* 466 F.Supp.2d 1020, 1027 (N.D.Ill.2006) (explaining that evidence need not be admissible in the foreign court in order to be discoverable).

*In re Green Dev. Corp. S.A. de C.V.,* No. WDQ-15-2985, 2015 WL 10319091, at *2 (D. Md. Oct. 1, 2015) (citation omitted), *report and recommendation approved sub nom. In Re Green Dev. Corp. S.A. De C.V.,* No. CV CCB-15-2985, 2016 WL 640791 (D. Md. Feb. 18, 2016).

Additionally, Comstock's argument that Petitioner has not met the mandatory "for use" requirement is meritless, as it relies on conditions that Section 1782 simply does not impose. **First,** Comstock asserts that Petitioner has already requested the same information in the Indian Action. But although Petitioner has indeed requested an "order directing the [Indian Action] Defendants to disclose the details as to who had hired Defendants to publish the stories and from where they had obtained information," this request would only touch upon Blair serving as a source for MEAWW's defamatory articles, without clarifying her incentive to do so, her coordination with other parties, and other relevant information. Moreover, Comstock cites no authority for its suggestion that information which is also being sought in a foreign proceeding is not properly obtainable via Section 1782.

**Second,** Comstock asserts that the discovery before this Court is preceded by a "requirement that Snyder first prevail in the India Action[,]" but no such requirement exists. Section 1782 requires only that foreign proceedings "be within reasonable contemplation"—not necessarily that they have already commenced, let alone that the applicant has already prevailed. *Intel Corp.*, 542 U.S. at 249.

**Third,** Comstock suggests that Petitioner should have included a declaration from an expert on Indian law, but again, Section 1782 does not impose this requirement. Discovery that "can be made use of in the foreign proceeding to increase [an applicant's] chances of success" is available under Section 1782, and Petitioner has shown that information regarding Blair's tenancy in Comstock buildings is relevant to her participation in the broader scheme of defamation that underlies the Indian Action, meeting this standard. *Mees*, 793 F.3d at 299. In short, Comstock fails to establish that the "for use" condition for discovery under Section 1782 is not met.

### C. The Court Should Exercise its Discretion to Permit the Requested Discovery

#### 1. The Discretionary Factors Support this Petition

The four discretionary factors outlined by the Supreme Court in *Intel Corp.*, which bear on whether a court should permit discovery that meets the mandatory conditions of Section 1782, are also met, as outlined in the Petition. Those are: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the foreign proceeding, and the receptivity of the foreign court to federal-court assistance; (3) whether the application conceals an attempt to circumvent foreign proof-gathering restrictions of a foreign country; and (4) whether the application is unduly intrusive or burdensome. *In re Chevron Corp.*, No. 7:10-MC-00067, 2010 U.S. Dist. LEXIS 125174, at *6-7 (W.D. Va. Nov. 24, 2010) (quoting *Intel Corp.*, 542 U.S. at 264-65).

All four of the preceding factors support the relief requested. **First,** neither Comstock nor Blair is a party to the Indian Action. **Second,** Comstock has not shown that the court hearing the Indian Action would be unreceptive to the discovery sought in this application. **Third,** Comstock has similarly not demonstrated that Indian discovery rules or public policies would bar the type of discovery sought herein. And, **fourth,** the discovery sought from Comstock consists of specific requests tailored to Comstock's dealings with a single tenant, whose documents can presumably be easily located in Comstock's records and disclosed and/or reviewed by a deponent.

#### 2. Comstock's Cited Authorities are Inapplicable

The authorities cited by Comstock are not to the contrary, as they merely state general principles applicable to Section 1782 or are distinguishable. For instance, *Cook v. Howard*, 484 F. App'x 805 (4th Cir. 2012), which Comstock cites for the principle that courts do not permit fishing expeditions via Section 1782, is distinguishable in that the discovery requests rejected in

*Cook* "were directed at matters related to . . . dismissed claims" that were no longer part of the case. *Id.* at 812. That is not true in this instance.

Next, Comstock cites *In re Green Dev. Corp. S.A. de C.V.*, *supra*, for the general notion that speculative discovery is disallowed under Section 1782. That said, *In re Green Dev. Corp. S.A. de C.V.* is wholly distinguishable based on the facts. The information sought in that case pertained to a journalist who wrote an article critical of the petitioner, which purportedly was sent to the Supreme Court of Honduras while an appeal, to which the petitioner was a party, was pending. Unlike the foreign action here, the foreign proceeding *In re Green Dev. Corp. S.A. de C.V.* was not a defamation action.

In addition, unlike the circumstances presented now, there was "no evidence" that the person from whom information in *In re Green Dev. Corp. S.A. de C.V.* was sought had "any relationship with or knowledge of any information regarding an adverse party in the [foreign] proceedings—or, indeed, that he had anything to do with the alleged sharing of his article with the justices of the Honduran Supreme Court." *In re Green Dev. Corp. S.A. de C.V.*, *id.*, at *3.[2] In stark contrast here, the evidence shows that Blair was intimately involved in the smear campaign to defame Petitioner and exhibited advance knowledge of numerous forthcoming negative publications about Petitioner and the Team.

Moreover, the Court in *In re Green Dev. Corp. S.A. de C.V.*, *id.*, at *4, denied the discovery request because the information sought: (1) was not beyond the foreign court's territorial

---

[2] In fact, as the District Court in *In re Green Dev. Corp. S.A. De C.V.*, No. CV CCB-15-2985, 2016 WL 640791 (D. Md. Feb. 18, 2016), observed, the petitioner alleged that someone other than the journalist "was the source" of the defamatory information conveyed to the Honduran Supreme Court.

jurisdiction, and (2) was potentially "secret, classified, or otherwise protected as a matter of national security." Neither of those circumstances exists here.[3]

Furthermore, *EEOC v. Dolgencorp, LLC*, No. SAG-18-2956, 2019 U.S. Dist. LEXIS 220340 (D. Md. Dec. 23, 2019), also cited by Comstock, is similarly distinguishable. First of all, *EEOC* did not even involve Section 1782. And unlike the discovery requested here (which has a meaningful connection to the Indian Action), the discovery requested in that case lacked a predicate basis. By way of background, in *EEOC v. Dolgencorp, LLC, supra,* the EEOC alleged that Dolgencorp, LLC created a sexually hostile work environment through a manager named Darrel Moses, and constructively discharged a woman named Amber Jacobs. During the proceeding, Dolgencorp had subpoenaed Ms. Jacobs' prior employer seeking personnel records and disciplinary materials, on the strength of a single remark by Darrel Moses at his deposition that Moses' wife had worked with Ms. Jacobs at that prior job, and had told Moses that Ms. Jacobs "was trouble." *Id.* at *2. The District Court found that Ms. Jacobs' conduct at a prior job had very limited relevance to the issues in the case, and that a mere statement that Ms. Jacobs "was trouble" was too speculative a basis to support a broad subpoena to a third party. *Id.* at *3-4. Here, the predicate for the discovery sought in this application is much clearer.

---

[3] In a related case cited by Comstock, *Green Dev. Corp. S.A. De C.V. v. Zamora*, No. 15-21594-MC, 2016 WL 2745844, at *2 (S.D. Fla. May 10, 2016), the same petitioner, Green Development Corp., sought additional Section 1782 discovery from another party without disclosing to the Court the prior related case discussed above. After the Court admonished petitioner for not making that disclosure, it denied the discovery request on the ground that the "allegations of litigation misconduct before a foreign court," the underlying basis for the petition, "rested on nothing more than speculation." *Id.*, at *7. In fact, the Court recognized that the evidence did not even support a finding that the Honduran Supreme Court ever received the alleged defamatory article in the first instance. In this matter, there is no dispute that defamatory statements were, in fact, published about Petitioner. And, the evidence makes clear that during the relevant period, Blair participated in a smear campaign to defame Petitioner while having advance knowledge of numerous forthcoming negative publications about Petitioner. Nothing about the allegations here are merely speculative.

### 3.  Petitioner has Sufficient Reason For the Discovery Sought

Blair herself made clear that she was coordinating with media entities in fishing for negative information on Petitioner around the time that MEAWW's defamatory articles were being prepared and published.  Moreover, Blair did so while simultaneously offering or alluding to the availability of bribes to current employees of the Team in furtherance of a smear campaign against Petitioner, thereby evidencing that she, herself, was a recipient of such ill-gotten consideration.  Plainly, Petitioner has a reason to investigate Blair's participation in the effort to defame him, and one facet of that is the question of whether she is being financially supported by some backer, in light of the disconnect between her known financial difficulties and the fact that she lives in Comstock's luxury apartments.  The discovery sought from Comstock is tailored to that specific, relevant issue.

Additionally, Comstock's claim that Blair received the same benefit as other Team employees is wholly disingenuous.  Specifically, Comstock asserts that persons other than Blair received certain discounts by virtue of their "association" with Snyder and the Team. ECF 6 at p. 5, ¶ 15. And, clarifying what such "discounts" included, Comstock's counsel, Jubal R. Thompson, Esq., in his declaration dated August 21, 2020, explained "Team affiliates receive certain discounts **(like application fee waivers to lease apartments)** as an incentive based on their affiliation with the Team." *See* ECF 7, at p. 7, ¶ 29 (emphasis added).  Here, however, Blair received discounts after she was no longer employed by or associated with Snyder and the Team as of 2017.  And, such discounts went far beyond an application fee waiver.  Indeed, Blair received discounted rent when she moved to another luxury apartment building owned by Comstock in 2018, and was thereafter upgraded to an even more luxurious apartment within the same building within the 60 days preceding the instant petition.  Thus, Comstock's effort to justify its discounted rent to Blair

– an ex-employee who has not been associated with Petitioner and the Team for three years – only further supports the relevancy of the information sought in this petition.

For that matter, Comstock's argument that this petition should be denied because "Comstock affiliates, not Respondent Comstock, own and manage the buildings at issue" lacks merit. *See* ECF 6, at p. 16. Irrespective of that proffered distinction, Comstock does not deny that it has possession, custody and/or control of the material sought. In fact, in a recently published New York Times article dated August 24, 2020 (Exhibit A, at p. 4, hereto), founder and chief executive of Comstock, Christopher Clemente, acknowledged his awareness of the amount Blair pays for rent and, with regard to the material sought, is quoted saying: "Dan Snyder could have just called me and asked for the information and I would have told him."

That stated position begs the question why Comstock would now waste the Court's time and resources to resolve this dispute. Perhaps the answer lies in Comstock's apparent collusion with Blair, as evidenced by its demand that Petitioner's former counsel, Reed Smith LLP, withdraw in this proceeding based on a ridiculous assertion that it "continuing in this proceeding with regard to Mary Ellen Blair would … create a conflict of interest." *See* ECF 5, at p. 1. Notably, despite Comstock submitting a seven-page declaration in which it extensively details Reed Smith LLP's current representation of it, Comstock failed to allege one factual basis within that document to support its contention regarding Blair. *See* ECF 7. The fact that Comstock, through its counsel, would assert a baseless conflict claim as to Blair, ostensibly to protect her in this proceeding, evidences more than just a simple landlord-tenant relationship.

In any event, Comstock, through its chief executive, conceded having the information sought in this petition. Furthermore, to the extent Comstock suggests that the subpoenas seeking such information are somehow insufficient because "Comstock affiliates" own and manage the

buildings at issue, it bears emphasis that the subpoenas are specifically directed at Comstock and its "subsidiaries" and "affiliates." *See* ECF 1-5, at Schedule A, p. 1, ¶ 2; ECF 1-6, at Schedule A, p. 1, ¶ 2.

### 4.  Comstock Attempts to Distract From the Relevant Analysis

Finally, Comstock raises numerous objections that are entirely irrelevant to this analysis. For instance, Comstock argues that counsel's statements in an interview render the discovery sought in this action improper.  Here, Comstock certainly makes too much of Joe Tacopina's statement that "[t]he goal is to ensure that the full weight of the law comes down heavily on those responsible [for defaming Petitioner]." *See* ECF 6-1, at 13:1-15. Counsel using the word "yes," in a response that otherwise contains no indication whatsoever that Petitioner plans to file an action here in the United States on the same subject, is a thin reed indeed to support the assertion that Petitioner will do so.  Comstock also makes much of the fact that Norman Chirite apparently resigned from Comstock's board of directors shortly before the Indian Action was filed. Comstock's efforts to ascribe sinister implications to this fact are unpersuasive. *See* ECF 13.  Mr. Chirite has no part in this action, and his employment status has no bearing on whether this Court can or should grant the discovery Petitioner seeks.  Indeed, Comstock's protests that Petitioner's requests for discovery are speculative ring hollow given the weight Comstock places on empty speculation about Norman Chirite's potential connections to Petitioner.

Comstock's remaining contentions are baseless.  If Comstock believes the discovery sought in this application is overbroad or otherwise improper, it is free to move the Court for appropriate relief and make its case in full.  Its brief references to the Court's power to grant a protective order or quash a subpoena are not sufficient reason to deny this application, and do not

alter the fact that the mandatory and discretionary factors favoring discovery in aid of a foreign proceeding are met.

## **CONCLUSION**

For the foregoing reasons, and those stated in the Petition and its supporting papers, this Court should grant Petitioner's application and permit Petitioner to take the specified discovery from Comstock in support of the Indian Action.

Dated: August 27, 2020
      Fairfax, Virginia                 NOVA BUSINESS LAW GROUP, LLP

                                By:  */s/ Christopher J. Williams*
                                    Christopher J. Williams (VSB No. 87234)
                                4151 Chain Bridge Road
                                Fairfax, VA 22030
                                Tel: (703) 766-8081
                                cwilliams@novablg.com

                                Joseph Tacopina
                                TACOPINA, SEIGEL & DEOREO
                                275 Madison Avenue
                                New York, New York 10016
                                Tel:  (212) 227-8877
                                jtacopina@tacopinalaw.com

                                *(Admission Pro Hac Vice Pending)*

                                *Attorneys for Petitioner*
                                  *Daniel Snyder*

# EXHIBIT A

The New York Times    https://nyti.ms/32itv62

# Private Infighting Roils Owners of Washington N.F.L. Team

The team's principal owner, Daniel Snyder, wanted to overhaul it this season, but, as court filings show, that task has been complicated by factions between him and the franchise's other shareholders.

 

By Ken Belson and Katherine Rosman

Published Aug. 24, 2020   Updated Aug. 25, 2020

Michael MacCambridge spent five years writing his 2005 history of the N.F.L., visiting team after team around the country. From the stability of the Pittsburgh Steelers to the emerging dynasty in New England, he learned that great franchises thrived and overcame obstacles with a mix of talent, trust and patience.

And then there is the Washington Football Team.

MacCambridge said that rarely in his travels did he see a team confronting as many problems as Washington is now. Like many N.F.L. team owners, Daniel Snyder has faced his share of losing on the field and scandals in the front office during his 21-year stewardship of the club. Some problems were the result of bad luck. Others were self-inflicted.

Snyder, though, is now juggling calamities on several fronts. In just the past few months, he ditched the team's 87-year-old name and logo after a revolt by sponsors, hired a law firm to investigate reports of sexual harassment in the front office and began a legal battle that has implicated a limited partner who is trying to sell his shares in the franchise. Most recently, the head coach he hired to revive the team said he would lead while undergoing cancer treatment.

"The Washington Football Team is like Charlie Brown trying to fly his kite and getting it caught in the tree," said MacCambridge, the author of "America's Game: The Epic Story of How Pro Football Captured a Nation." "There have been teams that were historically bad. The frustration that the fans in Washington are experiencing is that they've been waiting an awful long time to get a sense that their club has a positive sense of direction, and they're still waiting."

At the start of the year, Snyder, who declined to be interviewed for this article, began what seemed like a modest overhaul: another attempt to pull his franchise out of the dumps. But weeks before the start of the 2020 N.F.L. season, his team has been rocked by cataclysmic events, any of which would amount to a crisis. Taken as a whole, they have forced Snyder to rethink previously intractable positions and go on the attack against threats to his stewardship of the team, real or perceived.

In the century-long history of the N.F.L., rarely has a team faced this much turmoil at once.

## A football overhaul gives way to a reckoning on race.

After finishing the 2019 season with a 3-13 record and failing to make the playoffs for the fourth consecutive year, Snyder started to rebuild by firing his longtime team president, Bruce Allen, and in December 2019 bringing in Ron Rivera, who had spent nine seasons coaching the Carolina Panthers, to fix the team's performance.

Rivera, who is highly regarded among N.F.L. peers as a straight shooter, started with a tall task by normal football standards. He is the 10th coach to lead the team since Snyder arrived in 1999, a tenure during which the team finished above .500 only six times. More than 20 quarterbacks have started games for Washington in the past two decades.

Rivera's job grew more difficult, and stranger, by the week. He renovated the sideline, bringing in his own coordinators, position coaches, scouts and talent evaluators.

Then the pandemic hit and protests of George Floyd's killing while in police custody in Minneapolis gripped the country, prompting Rivera to expand his management of the team to include expressing his support for players protesting racial injustice.

The movement to reckon with race reached the organization in June. Snyder removed the name of the team's founder, George Preston Marshall, from the stadium and team archives while under pressure to acknowledge Marshall's resistance to signing African-American players — he was the last owner to do so — and his decision in 1933 to name the team the Redskins, which many consider a racist slur of Native Americans.



Ron Rivera, 58, revealed that he had squamous cell carcinoma detected in a lymph node last week. He will continue to coach while undergoing treatment. Alex Brandon/Associated Press

Then FedEx joined with other sponsors in calling on Snyder to change the team's name, going further to threaten to end its $8 million per year sponsorship of FedEx Field, Washington's stadium. Snyder had previously dug in his heels, telling reporters in 2013: "We'll never change the name. It's that simple. NEVER — you can use caps."

He had maintained that stance even in the face of pushback from activists, politicians and some fans, but finally relented in mid-July.

## Snyder hints at an ownership coup.

Behind the scenes of what seemed to be a shift caused by societal change, Snyder had been at war with Frederick W. Smith, the FedEx chairman.

Smith, Dwight Schar, a real estate developer, and Robert Rothman, an asset manager, collectively own 40 percent of the franchise and have been members of Snyder's inner circle since they bought into the team in 2003. But they have been looking to divest for many months.

Snyder took umbrage and several months ago removed them from the board. Aggrieved, the three men asked the N.F.L. to resolve the matter, and other issues. The commissioner's office appointed an arbitrator in late June, according to two people familiar with the matter who were not authorized to speak publicly. The N.F.L. declined to comment.

Selling small stakes in N.F.L. teams is hard because prospective buyers have to spend millions of dollars but often do not receive voting rights. The economic slowdown in the spring whittled the field of potential big spenders, but a sale of the entire franchise, rather than a piecemeal sell-off, would net a higher fee for all involved.

In legal filings in the past month, Snyder has claimed there is an effort to discredit him, presumably to increase the pressure on him to sell. Snyder has no intention of doing so, according to two people who speak with him regularly but spoke on condition of anonymity.

Schar and Rothman did not respond to requests for comment. Through a spokesman, Smith declined to comment for this article.

Snyder has not denied the main elements of an article The Washington Post published last month that detailed claims from 15 women that they were sexually harassed while employed by the team. Snyder hired the law firm Wilkinson Walsh to review the claims, which included numerous accusations of misconduct and abusive behavior by several team executives and football personnel over more than a dozen years.

## Who's Who in the Snyder Chronicles

A series of events has beset the Washington N.F.L. franchise over the past year. Here are some of the individuals involved.

ON THE INSIDE

**Daniel Snyder**      **Tanya Snyder**      **Ron Rivera**      **Jason Wright**      **Norm Chirite**      **Julie Donaldson**

| | | | | | |
|---|---|---|---|---|---|
| Principal owner of Washington N.F.L. franchise since 1999 | Daniel Snyder's wife | New coach; doubled as face of franchise in recent months | Recently hired team president; former N.F.L. player, and consultant at McKinsey & Co. | An adviser; recently returned to working with Snyder | Recently hired senior vice president of media |

| **Dwight Schar** | **Robert Rothman** | **Frederick Smith** | **Alex Santos** | **Richard Mann II** |
|---|---|---|---|---|
| Minority shareholders who hold about 40 percent of the club and are trying to sell their stakes | | | Former team executives fired before the published article about alleged sexual harassment | |

| **Christopher Clemente** | **Mary-Ellen Blair** | **Larry Michael** | | **Bruce Allen** |
|---|---|---|---|---|
| Son-in-law of Dwight Schar and C.E.O. of the company that manages an apartment building where Mary-Ellen Blair lives | Named in a legal filing, accused of trying to dig up dirt on Snyder, having a "financial benefactor" | Former broadcaster; resigned before harassment article published | | Former longtime team president fired at the end of last season |

| **Nirnay Chowdhary** | **Anay Chowdhary** |
|---|---|
| Brothers behind Media Arts Entertainment WorldWide, an Indian website that has been sued by Snyder for defamation | |

By The New York Times; Photograph by Brad Mills/USA Today, via Reuters

The team's longtime play-by-play announcer, Larry Michael, retired, and Alex Santos, the director of pro personnel, and Richard Mann II, the assistant director of pro personnel, were fired. All three were accused of sexual harassment by former team employees, according to the article.

The article, though damning, did not confirm any of the salacious rumors about Snyder that circulated before its publication on an internet news site, social media and message boards.

An Indian media company published articles that purported to link Snyder with the sex criminal Jeffrey Epstein, and one made reference to sex trafficking allegations against Snyder in its headline. While the team owner could do little about the speculation on social media accounts that referenced these articles, Snyder demanded that the website, Media Entertainment Arts WorldWide, remove the articles. The company complied.

In August, Snyder filed a defamation lawsuit in New Delhi against M.E.A. WorldWide in an attempt to force the company to disclose the source of the articles and whether it was paid to publish them.

Nirnay Chowdhary, a founder of the company, told The New York Times that "some sort of errors" were made in the posts about Snyder. But he denied that his company was paid to run the articles and said there would be an investigation of the situation.

Last week, the judge in the case gave M.E.A. WorldWide four weeks to provide an affidavit that disclosed its sources, according to a court document.

In connection to the lawsuit in India, Snyder's lawyers have sought permission in United States federal court to conduct discovery inquiries to learn, among other things, if Schar was part of a scheme to leak negative stories about Snyder.



Snyder fired Washington's head coach, Jay Gruden, center, and team president, Bruce
Allen, left, in 2019 as part of a front office overhaul.  Patrick Mcdermott/Getty Images

## The search for motive heads to court.

To make that link, Snyder's lawyers have zeroed in on Mary-Ellen Blair, an executive assistant to Snyder before she left the team in 2017.
They claim that beginning in May or June, Blair contacted former colleagues to ask if they had heard about forthcoming articles about
Snyder.

Blair, who has during her career worked for a number of powerful executives, including Arn Tellem and Harvey Weinstein, told a personal
employee of Snyder's and two other team employees that "she was in contact with and working in coordination with a third party" and
that they were involved in articles that were going to be damaging to Snyder, according to the motion to conduct discovery in the
defamation suit.

According to a transcript of one call which was recorded, Blair said that Schar had called her to let her know The Washington Post would
be publishing an article damaging to Snyder.

Snyder has also contended in court documents that Blair has a "financial benefactor" providing her discounted rent in luxury apartment
buildings in Virginia. Snyder has asked for Blair's rent records from the company that manages the buildings, Comstock Holdings.

Lisa Banks, a lawyer for Blair, said that her client paid the market rate for her apartments herself and was not involved in any way in the
articles published in India. Banks said that Snyder's focus on Blair is "an attempt to intimidate not only my client, but also those who
might speak poorly about Dan Snyder to legitimate media outlets, including his former employees and business partners."

The founder and chief executive of Comstock, Christopher Clemente, is Schar's son-in-law. Clemente said that there was nothing to hide
and that Snyder was trying to create a distraction from the investigation of the team's front office.

"Dan Snyder could have just called me and asked for the information and I would have told him," Clemente said, adding that he has known
Snyder for years. "Why he's doing it in the press and in the courts is because he's just trying to stir something up and deflect from the
drama that goes on at Redskins Park." (In a filing, Comstock asked the court to deny Snyder's request for discovery, calling it a
"speculative fishing expedition.")

Clemente said that Blair pays market rent. He and his father-in-law together are the principal owners of a Comstock division that manages
assets including the apartment building Blair lives in, but Clemente said Schar has no hand in the day-to-day operations.

Clemente questioned the motives of Norman Chirite, who served as general counsel to the Washington team from 2002 to 2005 and joined
the Comstock board in 2004. Chirite stepped down from his role with Comstock two days before the M.E.A. WorldWide suit was filed and
returned to work for Snyder full time. Clemente said Chirite may have broken board governance rules if he assisted Snyder in litigation
that could involve Comstock.

Chirite did not respond to a request for comment.

## The N.F.L. season is approaching.



In lieu of a new name and logo, the Washington Football Team will feature minimal
branding on helmets and jerseys this season.  Alex Brandon/Associated Press

Even as Snyder continues his legal battle, he has made several hires charged with making serious changes to the club's culture. They include Jason Wright, first Black team president in league history, and Julie Donaldson, a white woman, who became senior vice president for media and a game day radio broadcaster, replacing Larry Michael, one of the male team employees accused of harassment. Terry Bateman, who is white, was brought on to run the team's marketing.

After Bateman and Donaldson were hired in late July, the Fritz Pollard Alliance, which promotes diversity in football, asked the N.F.L. to confirm that the team followed Rooney Rule guidelines that require at least one person of color or one woman, or both, to be interviewed for any open senior level positions. The N.F.L. is continuing to investigate.

When the Washington Football Team plays the Philadelphia Eagles in its first game of the regular season on Sept. 13, it will do so in a fan-free home stadium, led by a coach battling cancer. The franchise will most likely still be searching for a new team name and logo, awaiting the results of an independent investigation of sexual harassment in the front office, and court rulings in the United States and India.

Football will, for once, be the least troubling issue Snyder faces in Washington.

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2020, I caused a copy of the foregoing to be electronically filed using the CM/ECF system, which will send notification to counsel of record of such filing by operation of the Court's electronic system.  Parties may access this filing via the Court's electronic system.

NOVA BUSINESS LAW GROUP, LLP

By: _/s/ Christopher J. Williams_
    Christopher J. Williams (VSB No. 87234)
4151 Chain Bridge Road
Fairfax, VA 22030
Tel: (703) 766-8081
cwilliams@novablg.com

Joseph Tacopina
TACOPINA, SEIGEL & DEOREO
275 Madison Avenue
New York, New York 10016
Tel:  (212) 227-8877
jtacopina@tacopinalaw.com

_(Admission Pro Hac Vice Pending)_

_Attorneys for Petitioner_
  _Daniel Snyder_